Filed 4/18/13  P. v. Melanson CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>ROY ALLEN MELANSON,<br><br>　　　　Defendant and Appellant. | A133688<br><br>(Napa County<br>Super. Ct. No. CR152581) |

## I.  INTRODUCTION

In September 2011, a jury convicted Roy Melanson of the July 1974 murder of Anita Andrews.  (Pen. Code, § 187, subd. (a).)  Melanson was sentenced to life in prison with the possibility of parole.  On appeal, Melanson contends the judgment must be reversed because (1) evidence of several uncharged offenses was erroneously admitted at trial; (2) this case should have been dismissed for precharging delay; and (3) a photographic line-up was impermissibly suggestive.  We reject these contentions and affirm the judgment.

## II.  STATEMENT OF FACTS

### A.　*The Murder of Anita Andrews*

In 1974, Anita Andrews and her sister Muriel Fagiani owned Fagiani's bar in Napa.  Andrews, who was 52, had a day job at a hospital and worked at the bar six evenings a week.  Andrews was clean, neat and fastidious, with set routines and habits.  She always dressed well, wore jewelry and carried a purse containing her checkbook, cash, makeup and car keys.  She would open the bar at around 5:00 p.m. and closed up

some time between 9 and 11:00 p.m.  There were never many customers.  When she worked at the bar, Andrews wore a black diamond onyx ring so customers would think she was married.  She also wore a Bulova watch, and a bracelet.  She parked her 1967 tan Cadillac in front of the bar.

On the evening of July 10, 1974, David Luce and two friends stopped at the bar for a drink while on their way to dinner.  There was only one other customer; a Caucasian man, possibly in his 40's, with a wet, flattened hairstyle and thin lips, sat at the bar drinking a beer and smoking a cigarette.  The man, whose legs were crossed in a strange manner, sat turned away from Luce and his friends and covered his face with his hand.  One of Luce's friends yelled at the man, wanting to know why he was hiding his face from them.  The man did not respond.  Luce convinced his friend to stop and later apologized and shook the man's hand, which was soft and limp.  At one point, Luce asked the bartender if the man was her boyfriend and she said that he was.[1]  Luce and his friends stayed at the bar for no more than half an hour and when they left, at around 9:30 p.m., Luce had the feeling the bartender was waiting for them to go so she could close the bar.  Several hours later when Luce walked by the bar again, the door was closed, the lights were out, and the Cadillac that had been parked outside earlier was gone.

The next morning, Napa Police Officer Joseph Moore responded to a call from the bar.  Muriel Fagiani, who looked to be in shock, told Moore she thought her sister had been raped and directed him to a storeroom where he found Andrews dead on the floor.  Her clothes were torn and in disarray and blood pooled around her upper torso.  Moore secured the area, other officers arrived, and a bulletin was issued for Andrews' missing Cadillac.  That morning, David Luce heard about the Andrews murder and contacted the police to report what he had seen.  Later that same day, an unidentified man used

---

[1]  Andrews' daughter, who was 23 when her mother was killed, testified that she last spoke to Andrews a week before the murder.  Andrews did not have a boyfriend at that time but she told her daughter that a man she had briefly dated was bothering her.  He ran up a $400 bill on her phone and she was keeping his tools in the trunk of her car until he paid her back.

2

Andrews' credit card in Sacramento to buy gas for her Cadillac. However, the car was never recovered.

**B.**     *The Crime Scene Investigation*

On the morning of July 11, 1974, the Napa District Attorney employed a criminalist named Peter Barnett to work on the Andrews homicide case. Barnett arrived at the bar at around 10:45 a.m., collected evidence and documented observations that were relevant to the investigation.

The bar counter had been recently wiped with a towel and was clear except for an ashtray containing one cigarette butt, a shot glass and a mixing spoon. At an angle from the ashtray, one bar stool was moved out from the row of neatly arranged stools under the bar. The sink area behind the counter was also clean and clear except for a screwdriver sitting on the drain which left a rust mark where it had been placed when wet. Three basins in the sink were filled with a small amount of water. The water from the middle basin tested presumptively positive for blood. A crumpled and stiffened towel was on the floor under the sink. There were blood stains on the bar floor, about two feet from double doors connecting the bar area to a storeroom. The pattern of the stain suggested someone had walked there after suffering an injury like a bloody nose or face laceration.

Andrews was found on the storeroom floor, on her back, partially unclothed. Blood pooled on the floor and was splattered on the walls and over many of the objects in the storeroom. Andrews' clothes were torn, punctured, and partially removed from her body. Her pants and underclothes were removed from her right leg, but remained on her left leg, which left her genitals exposed. Her blouse had been opened and her brassiere pulled down, exposing her breasts. There was glass on the floor and in Andrews' hair. Two loose buttons and one of Andrews's shoes were on the storeroom floor and an earring was found in the bar area just outside the storeroom. Andrews was not wearing her watch, ring or other jewelry and investigators did not find a purse, pocketbook, credit card or car keys. Bloody shoeprints that were not made by Andrews led from the storeroom to an upstairs office which contained a cash box and a safe. Another shoeprint was found just inside the front door of the bar.

**C.**    *Pathology Evidence*

On July 11, 1974, Dr. David Clary conducted an autopsy of Andrews' body. Dr. Clary died in 1982. Dr. Anthony Chapman, who testified at Melanson's trial as an expert in forensic pathology, reviewed Clary's autopsy report, photographs from the autopsy and various investigative reports pertaining to the Andrews homicide. Dr. Chapman determined that Andrews died from multiple stab wounds to the body, especially to her chest, combined with an injury to the head. The nature and distribution of the injuries that Andrews sustained confirmed that she was the victim of "homicidal violence."

The 13 stab wounds that Dr. Chapman independently documented were inflicted by a thin, pointed instrument which could have been a screwdriver. Andrews also sustained several blunt force lacerations, including a laceration on her scalp and a skull fracture that could have been inflicted with a glass bottle. Andrews also had bruises and abrasions on various parts of her body, a broken nose and other injuries consistent with being punched. The condition and positioning of Andrews' clothes, and a bloody towel found near her genital area were signs that a sexual assault was intended. However, there was no physical evidence that one occurred.

**D.**    *The Case Against Melanson*

In late 2001, Police Officer Peter Jerich reopened the Andrews homicide case and submitted a request to the Department of Justice (DOJ) to conduct DNA testing on several items from the crime scene and on two items from a man named Liston Biel, who had been a prime suspect at the time of the murder. In May 2006, the Andrews case was reassigned to Detective Donald Winegar. Winegar took the case because he had recent experience on a major case that benefited from advancements in the field of DNA evidence. Winegar followed up on Detective Jerich's earlier request for DNA testing with a DOJ criminalist named Michelle Terra.[2]

---

[2] At trial, Terra confirmed that Detective Jerich requested DNA testing in December 2001. However, because of a significant backlog at the DOJ testing facility in Sacramento, Terra did not start work on this case until January 2004.

Through her analysis, Terra determined that (1) Liston Biel's DNA was not found on any crime scene evidence she tested; (2) Andrews' blood was on three towels collected from various locations in the bar, including the towel found under the sink behind the bar (the sink towel); (3) there were indications that male DNA was also on the sink towel, but additional analysis called Y-STR testing was required to identify a potential match.

In November 2006, Terra sent the sink towel and reference samples to Serological Research Institute (SERI) for Y-STR testing. A partial DNA profile generated in 2007 excluded Liston Biel as a donor of the blood on the sink towel.

In 2008, Terra tested additional items from the crime scene. Although she was unable to create a profile for the screwdriver, Terra developed a full profile for DNA recovered from the cigarette butt that was found in the ashtray at the crime scene. After Terra excluded both Andrews and Biel as the source of the DNA, she conducted a database search which produced a perfect match with appellant Melanson's DNA.

In November 2009, Detective Winegar interviewed Melanson who was 72 years old at the time. The interview took place in a Colorado prison.[3] Melanson said he had never been in Napa and denied any involvement in a murder committed there in the summer of 1974. Melanson said he was living and working in Colorado that summer and, before that, he lived with family in Texas after spending some time in prison. Melanson claimed he did not "even know where Napa Valley is." When Winegar disclosed the DNA match, Melanson said the evidence was wrong and he also denied that his fingerprints were found at the crime scene. Winegar obtained another sample of Melanson's DNA, and also took his fingerprints and a writing sample.

The DNA sample Winegar obtained from Melanson confirmed a match with the DNA from the cigarette butt. Michelle Terra, the DOJ criminalist, calculated that such a match would occur among unrelated individuals once in 8.8 quintillion Caucasians, once in 170 quintillion Hispanics, and once in 570 quintillion African Americans. Melanson's

---

[3] A videotape of the interview was played for the jury at trial.

DNA also matched a profile of DNA that was found on the sink towel which was developed by an analyst named Gary Harmor in 2010. Harmor used Y-STR analysis to obtain a sample from that towel that generated a 10-marker profile. Harmor concluded that all 10 markers matched Melanson's Y-STR DNA profile. Harmor found only one match in his database of 11,393 males and calculated the rarity of this profile as one in 3,846 males.

Experts also analyzed Melanson's fingerprints and handwriting. Melanson's fingerprints were identified on five empty beer bottles and a rum bottle that were found behind the bar at the time of the murder.[4] A handwriting expert compared Melanson's writing sample to the signature on the credit card receipt for the gas that was purchased for Andrews' car after she was murdered. That analysis was inconclusive; there were some similarities but the quality of the gas receipt was poor, and there were also indications that Andrews' forged signature was scribbled to disguise the writing.

In January 2010, Detective Winegar showed David Luce a photo lineup containing photographs of six men, including a 1975 photograph of Melanson. Luce looked at the pictures for approximately 40 to 45 seconds and then identified Melanson as the man he saw in Fagiani's bar on July 10, 1974. Luce said that the eyes were what he remembered most. However, he also admitted that he was not 100 percent sure that Melanson was the man from the bar.

On July 19, 2010, the Napa County District Attorney filed a complaint charging Melanson with the first degree murder of Anita Andrews. In October 2010, the complaint was substituted with an indictment, and a jury trial commenced in July 2011.

E.    *The Uncharged Conduct Evidence*

In addition to the evidence summarized above, the prosecutor presented evidence that, between 1962 and 1974, Melanson raped three women, Reba R., Katherine O., and Sandra S., and that he murdered Michelle Wallace.

---

[4] A previous analysis of Liston Biel's fingerprints excluded him as a match with any of the fingerprints recovered from the crime scene.

6

### 1. *The Two Rape Convictions*

The prosecutor presented documentary evidence that Melanson was convicted of the March 29, 1962, rape of Reba R. and the February 20, 1974, rape of Sandra S. There was no evidence about the circumstances of the Reba R. rape, other than that it happened in Jefferson County, Texas, and that Melanson was punished for it. However, Sandra S. appeared and testified at this trial.

Sandra S. testified that she was 17 in February 1974 when Melanson pulled into a gas station in Texas where she had stopped to look for gas. Sandra S. recalled that Melanson looked "like an old cowboy" and that his hair was greasy and "slicked back." There was a gas shortage at the time and the station was closed, but Melanson said he knew another place to get gas. He suggested Sandra S. follow him in case she ran out of gas. As she was following, Melanson pulled over and gestured that he needed help. He asked her to try to start his truck while he looked under the hood. As Sandra S. complied, Melanson came over to the truck, pushed her down onto the floorboard and threatened to kill her if she tried to get up. Melanson drove to an empty field, where he raped Sandra S. several times. When she tried to hit the horn to get the attention of a car passing in the distance, Melanson slapped her, tied her up with her pantyhose and a rope and gagged and blindfolded her. Sandra S. testified that Melanson took her to a garbage dump where he raped her again and repeatedly threatened to kill her. He then drove her to another location, moved her to another car, and took her across the Louisiana border into the swamps and woods. At the last location, he raped her repeatedly, and told her if she did not enjoy it he would kill her. Sandra S. testified that Melanson was "frustrated and mad and forceful."

After the last time Melanson raped her, Sandra S. began to talk to him and he reacted as though he thought that they could become friends. Sandra S. offered to tell her mother that she had tried to run away, and told Melanson her mother would believe her because there were problems at home. Melanson told Sandra S. he would bring her to a pay phone where she could call her father and, as they drove back to Texas, he showed her his driver's license. He also told her that he was the uncle of a girl she went to school

with, and that he had been stalking her. Before letting her go, Melanson told Sandra S. he would kill her if she reported him.

### 2. *Katherine O.*

The prosecutor's evidence that Melanson raped Katherine O. consisted of prior testimony that Katherine O. gave at an August 1972 preliminary hearing in Texas. No evidence was presented that Melanson was convicted of any crime against Katherine O.

Katherine O. testified that on the evening of August 8, 1972, she was on her way to a club in Orange, Texas, when her car got a flat tire. Two men in a pickup truck stopped to offer assistance. The driver, Roy, was stocky with a beer belly. The passenger was younger, around 22, slender, and had short hair. The two men checked her spare tire, found that it was also flat and offered to drive her to get it fixed. En route, Roy said he needed to change trucks and then drove to a house where they left the passenger. Roy put the tire in a different truck and Katherine O. got in with him, thinking they would head to the "Billups" to get the tire fixed. Instead, Roy drove to a secluded area where he "lunged" at Katherine O., acting as though she would accept his advance. When she questioned him, Roy said he was going to "fuck" her. Katherine O. resisted, but the more she fought, the harder he fought back while using offensive language to describe what he was going to do to her. At one point, Roy punched Katherine O. in the face with a closed fist which stunned her, but she continued to resist until he twisted her arm back and pinned her down. Then Roy "forcibly" removed her clothing by pulling her pants completely off one leg and down to the knee of the other. He then repeatedly raped and sodomized her and forced her to perform other sexual acts, all the time talking to her and telling her to respect his wishes. This conduct went on for an hour and a half until Roy finally climaxed.

Katherine O. testified that, after Roy finished, he just sat there, at which point she decided to try to humor him, hoping she might outwit him. She made him laugh and offered him some tissue to clean himself. She threw the tissue out the window along with her torn underwear so that it could be found later. After she put her pants on, Roy started apologizing. Eventually, he drove to a gas station and arranged for someone to fix the

8

tire.  Roy then drove Katherine O. back to her car and changed her tire while she memorized his license plate number.  Roy apologized again and told Katherine O. he would follow her onto the highway.  As they began to drive in their separate cars, an acquaintance of Katherine O.'s drove by and stopped to check on her, at which point Roy drove away.

### 3.  *The Murder of Michelle Wallace*

The prosecution presented documentary evidence that in September 1993, a Colorado jury found Melanson guilty of the 1974 murder of Michelle Wallace.  The jury heard about the circumstances surrounding that crime through the testimony of three witnesses, Charles Mathews, Stephen Fry and Jimmie Smalley.[5]

On August 29, 1974, Charles Mathews met Melanson at a bar in Gunnison, Colorado.  Melanson complained about a bear that was going after his horses, so he and Mathews decided to go after the bear.  They drove together to a cabin where Melanson was staying.  They had been drinking a lot and arrived late, so they went to sleep.  The next morning, Melanson and Mathews drank some beer, spent some time driving around the cabin area and then headed back to Gunnison.  On the way, they had car trouble and started to walk.  Michelle Wallace stopped and offered them a ride.  Mathews rode in the back with Wallace's German Sheppard and Melanson rode in the front.  Wallace dropped Mathews off at the bar where he had met Melanson the night before.  However, Melanson asked Wallace to take him somewhere else and the two drove off together.

Wallace, a free lance photographer, was reported missing on September 3, 1974.  Stephen Fry, the Undersheriff at the Gunnison County Sheriff's Department, headed the investigation into Wallace's disappearance, which included an extensive air and land search of the mountainous park areas in the region where Wallace backpacked, camped and took photographs.  When Charles Mathews heard a radio news report that Wallace and her dog were missing, he contacted the sheriff's department and reported that

---

[5] The trial court admitted excerpts from testimony that Charles Mathews gave during Melanson's Colorado murder trial.  Fry and Smalley appeared and testified at the trial in this case.

Wallace had given him and Melanson a ride. The investigation expanded to include a search for Wallace's red Mazda, and for Melanson, the last person to be seen with Wallace.

On September 12, 1974, Melanson was arrested in Pueblo, Colorado, approximately 160 miles away from Gunnison. He'd been stopped by police because he was driving an older model Cadillac that was reportedly involved in selling drugs near the high school. A subsequent computer check revealed Melanson was wanted in Gunnison.

Pueblo Police Officer Jimmy Smalley interviewed Melanson who admitted he had been in Gunnison and that he knew Michelle Wallace, but claimed not to know her well. He said he had seen her hiking, and he knew she had a dog. But Melanson said he had never seen Wallace in a car and claimed he did not know what a Mazda looked like. In the Cadillac that Melanson had been driving, police found the registration for Wallace's Mazda, her insurance card and a Mazda tool kit. They also found a set of Wallace's car keys in the pocket of a pair of pants in a bag on the back seat of the car. Officer Smalley also discovered that Melanson signed a pawn ticket in a Pueblo pawnshop on September 3, 1974, which he used to recover Wallace's camera.

The Pueblo police transferred Melanson and the evidence they had collected to the sheriff's office in Gunnison. Undersheriff Fry found additional pawn slips and other papers belonging to Wallace in Melanson's wallet. Melanson had pawned Wallace's sleeping bag and backpack in Cedar Falls, Iowa. Film from the camera that Melanson had pawned in Pueblo contained a picture of Wallace, a picture of her dog and a picture of Melanson with another woman in a motel room. At some point, Wallace's car was located in Amarillo, Texas. However, by the end of October, there was no evidence of a body and the case went cold.

In 1979, a scalp with braided hair was found in the Bracken Creek area of Gunnison County. Analysts determined that the hair was human, but there was no DNA analysis at that time. The Wallace case was reopened in the early 1990's. In 1992, the

10

remains of Wallace's body were found in the same area where the scalp was previously located.

### III. DISCUSSION

**A.      *The Uncharged Conduct Evidence***

Melanson's primary contention on appeal is that all of the uncharged conduct evidence should have been excluded from his trial.  To support this claim of error, Melanson makes three distinct arguments:  (1) the Wallace murder should have been excluded under Evidence Code sections 1101 and 352[6]; (2) the prior rape evidence should have been excluded under section 352; and (3) section 1108 and a related jury instruction regarding the use of evidence of uncharged sex offenses are both unconstitutional.

**1.      *Legal Principles***

Section 1101, subdivision (a) (section 1101(a)), establishes a general rule excluding "evidence of a person's character or a trait of his or her character . . . when offered to prove his or her conduct on a specified occasion."  (See *People v. Branch* (2001) 91 Cal.App.4th 274, 280 (*Branch*).)  However, section 1101, subdivision (b) (section 1101(b)), clarifies that this general rule does not exclude evidence of uncharged conduct which is relevant to prove some fact other than bad character or criminal disposition, like intent, common plan or identity.  (§ 1101(b); *People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*).)

Furthermore, section 1101(a) is subject to statutory exceptions which may make character evidence admissible, including section 1108, which states:  "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."  (§ 1108, subd. (a).)

If a trial court determines that evidence of a criminal defendant's uncharged conduct is not excluded by the general rule codified in section 1101, the court must also

_____

[6] All further statutory references are to the Evidence Code.

independently consider whether the evidence should be excluded pursuant to section 352. (*People v. Balcom* (1994) 7 Cal.4th 414, 426 (*Balcom*).)  Evidence must be excluded under section 352 if its probative value is substantially outweighed by the probability that its admission would "(a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (§ 352.)

On appeal, we review rulings under sections 1101, 1108 and 352 for an abuse of discretion.  (*People v. Foster* (2010) 50 Cal.4th 1301, 1328-1329 (*Foster*) [sections 1101 and 352]; *People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1104 [sections 1108 and 352].)  " 'Under the abuse of discretion standard, "a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' [Citation.]" (*Foster, supra,* 50 Cal.4th at pp. 1328-1329.)

### 2. *The Trial Court's Rulings*

In the present case, the prosecution moved to admit evidence of seven uncharged acts.  As reflected in our factual summary, the trial court admitted evidence of four of those seven incidents.

The trial court found that evidence of the 1962 rape of Reba R. was relevant under section 1108 as a prior sex offense, and was not excluded by section 352.  The court reasoned that the incident was not too remote; the fact that there was a conviction established both certainty and prior punishment; and presenting the evidence would not be unduly time consuming because the prosecutor agreed to limit evidence to documentary proof of the conviction and punishment.

The trial court also admitted evidence of the 1972 rape of Katherine O. and the 1974 rape of Sandra S. under section 1108 and found that neither incident was excluded by section 352.  The Sandra S. rape was committed six months before the charged offense, was a prior sexual act, resulted in a conviction, and none of the section 352 factors weighed in favor of exclusion.  As for the Katherine O. case, the court weighed the fact that Melanson had not been punished for that offense, but it concluded that the incident was more probative than prejudicial.  The court noted, among other things, that

12

the incident was close in time, involved a Caucasian woman who was a stranger to the defendant, and the victim's clothes were partially removed during the sexual assault.

Finally, the court found that the 1974 murder of Michelle Wallace was admissible under section 1101(b) as probative of a common plan or scheme and that it was not excluded by section 352. The court reasoned that the two murders were committed within a six-week time period and, in both cases, the defendant got the woman alone, attacked and killed her. In concluding that the probative value was not outweighed by the danger of unfair prejudice, the court noted that neither murder was more inflammatory than the other, and the evidence would show that Melanson had already been punished for the Wallace murder.

However, the trial court excluded evidence of three other uncharged crimes: a June 1962 sexual assault of Sandra C., Melanson's 16-year-old cousin; the July 1988 disappearance and presumed murder of Pauline Klump; and the August 5, 1988, sexual assault and murder of Charlotte Sauerwin. The trial court excluded evidence of these three offenses pursuant to section 352. The court was concerned that the jury would be inflamed by the facts of the Sandra C. case, noting the victim's youth and the fact that Melanson had not been punished for this offense. In the Klump case, there was no evidence of a sex crime since a body was never found and the probative value was low because, as the court found, "[w]e don't really know what happened." Finally, the Sauerwin incident was relevant under section 1108 as a prior sex offense and under section 1101 as evidence of a common plan. However, there was no prior conviction, a mini trial might be necessary to prove the offense, and the jury might be overwhelmed by the number of uncharged crimes that Melanson had committed. Ultimately, the court concluded that the probative value of the Sauerwin evidence was outweighed by the substantial danger of undue prejudice and confusing the issues.

### 3. *The Wallace Murder*

Melanson contends that the Wallace murder was bad character evidence under section 1110(a) and that it was not admissible under section 1101(b) to prove a common design or plan because that crime was not sufficiently similar to the charged murder of

13

Anita Andrews. Alternatively, Melanson argues that this uncharged misconduct should have been excluded under section 352.

Uncharged act evidence is relevant to prove a common plan when "the uncharged misconduct and the charged offense are sufficiently similar to support the inference that they are manifestations of a common design or plan." (*Ewoldt, supra*, 7 Cal.4th at p. 402.) The charged and uncharged acts need not be part of a "single, continuing conception or plot." (*Id.* at p. 401.) However, the evidence must "demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' [Citations.]" (*Id.* at p. 402.) Furthermore, although the "common features must indicate the existence of a plan rather than a series of similar spontaneous acts, . . . the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense. [Citation.]" (*Id.* at p. 403.)

In the present case, the Wallace murder and the murder of Anita Andrews shared significant common features. In both cases, Melanson gained the trust of his victim; Wallace agreed to drive him somewhere alone after dropping Mathews off at the bar, and Andrews told Luce that Melanson was her boyfriend. In both cases, Melanson was the last person seen with the victim before she died; Wallace and Melanson were alone together in a car, and Andrews and Melanson were alone together in a bar at closing time. In both cases, there was evidence that Melanson killed his victim, took personal belongings from her, and took her car. Finally, in both cases, Melanson lied to authorities about his prior association with the victim; he told Detective Winegar that he had never been in the bar where Andrews was killed and he told Officer Smalley that he had never been in Wallace's car. Indeed, both denials were unnecessarily exaggerated. Melanson told Winegar that he did not know where Napa was and he told Smalley that he did not know what a Mazda was.

On appeal, Melanson contends the Wallace murder was materially different than the Andrews murder because he was with another man when he met Wallace and he was

14

alone at the bar when he met Andrews. Actually, there is no evidence about how Melanson first met Andrews. Regardless, this irrelevant detail does not alter the common features summarized above including that Melanson was the last person seen with the victim and the victim was left alone with him under circumstances which made her vulnerable to attack.

Melanson also contends that the Colorado case is not sufficiently similar to the charged murder because there was no evidence about how Wallace was killed; in contrast to the present case, there was no evidence that Wallace was physically or sexually assaulted. Preliminarily, we note that evidence Wallace's scalp was discovered many years before investigators found her other remains is consistent with the conclusion that she, like Andrews, was the victim of homicidal violence. In any event, Melanson cannot undermine the trial court's discretionary ruling simply by identifying this one distinguishing feature of the Wallace murder. The fact that Melanson hid Wallace's body so well that it decomposed before her cause of death could be conclusively determined does not preclude the inference of a common general plan in light of the other similarities we have already mentioned.

The common features of these two crimes support the inference that Melanson had a plan to assault, murder and steal from vulnerable unsuspecting women. The fact that Melanson implemented that plan in the Wallace case is relevant to show that he used the same general plan a few months earlier when he killed Anita Andrews. Therefore, we reject Melanson's contention that the trial court erred by finding that evidence of the Wallace murder was not excluded by the general rule codified in section 1101(a).

For similar reasons, we reject Melanson's alternative theory that evidence of the Wallace murder should have been excluded under section 352. This argument rests on the same erroneous premise that these two murders were "quite dissimilar." Furthermore, Melanson makes the unsupported assumption that the jury was unfairly prejudiced against him because of the "reassurance" that another jury had found Melanson guilty of the Colorado murder. As our Supreme Court has recognized, the fact that uncharged conduct resulted in a criminal conviction and substantial punishment decreases the

15

potential for prejudice, undue consumption of time, or confusing the issues in at least two ways. (*Balcom*, *supra*, 7 Cal.4th at p. 427.) First, the jury will not be tempted to convict the defendant of the charged offense, regardless of guilt, in order to punish him for the uncharged offense, because the jury will know he has already been sentenced to prison for the uncharged crime. Second, the jury's attention will not be diverted to a determination whether or not defendant committed the uncharged crime because that fact has already been established by the prior conviction. (*Ibid*.)

Melanson also argues that the danger of unfair prejudice was heightened because the evidence against him in the Wallace case was "much stronger" than the evidence that he killed Anita Andrews. For the record, we disagree with the factual predicate of this argument; Melanson consistently undervalues the strength of the evidence that he killed Andrews. Indeed, absent any sufficiency of the evidence claim on appeal, we take it as undisputed that the record supports the jury's finding that the prosecution proved beyond a reasonable doubt that Melanson murdered Anita Andrews. Furthermore, and in any event, the strength of the evidence supporting the charged offense is not a relevant factor under section 352. "The supposed weakness of the rest of the case would be relevant to the question of prejudice if there were error, but it provides no reason to exclude this particularly probative evidence." (*People v. Loy* (2011) 52 Cal.4th 46, 64.)

We conclude that the Wallace murder was probative of a common plan and that the trial court's decision to admit that evidence was supported by a thorough and careful consideration of the section 352 factors. Finding no basis to question the trial court's sound exercise of its discretion, we reject Melanson's contention that the trial court committed reversible error by admitting evidence of the Wallace murder.

### 4. *The Other Rape Evidence*

Melanson does not dispute that evidence of his uncharged rapes was relevant to prove that he intended or attempted to sexually assault Anita Andrews. (§ 1108.) However, he maintains that the trial court abused its discretion and committed reversible error by failing to exclude evidence of these rapes pursuant to section 352.

16

Section 1108 expands "the admissibility of disposition or propensity evidence in sex offense cases." (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).) "The effect of section 1108 was 'to assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility. In this regard, section 1108 implicitly abrogates prior decisions . . . indicating that "propensity" evidence is per se unduly prejudicial to the defense. [Citation.]' [Citation.]" (*Branch*, *supra*, 91 Cal.App.4th at p. 281.)

"By reason of section 1108, trial courts may no longer deem 'propensity' evidence unduly prejudicial per se, but must engage in a careful weighing process under section 352." (*Falsetta, supra,* 21 Cal.4th at pp. 916-917.) This "careful weighing process" ensures that section 1108 will be applied in a manner that does not violate the defendant's due process rights. (*Id*. at p. 917.) Factors to consider when evaluating an uncharged sexual offense evidence under section 352 include (1) its nature, relevance, and possible remoteness, (2) the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jury, (3) its similarity to the charged offense, (4) its likely prejudicial impact, and (5) the availability of less prejudicial alternatives, like excluding irrelevant inflammatory details or admitting some but not all of the other sex offenses. (*Id.* at pp. 916-917.)

The record before us confirms that the trial court engaged in the careful weighing process that section 352 requires. It admitted evidence of some, but not all, of Melanson's other sex offenses. Two of the three incidents that were admitted were supported by prior convictions, which reduced the burden on defendant and the danger of undue prejudice. The court limited evidence of the Reba R. case to the conviction itself and the Sandra S. testimony was brief, direct and clearly probative, not just of Melanson's propensity to commit a sex offense but also of his general plan to gain the trust of unsuspecting female victims. Furthermore, while the Katherine O. case was not supported by a prior conviction, the probative value of that evidence was very high in light of the similarities to the charged offense. In both cases, Melanson was physically violent, punched his victim in the face with a closed fist, and removed her pants and

17

underclothes from only one leg during the assault. Furthermore, the trial court guarded against undue prejudice by (1) excluding evidence that Melanson was held to answer for the Katherine O. rape; and (2) permitting the defense to introduce substantial excerpts from cross-examination testimony that Katherine O. gave at the preliminary hearing.

On appeal, Melanson contends that the prior rape evidence was unduly prejudicial because of the "great disparity in the strengths of the evidence in the current case compared to the prior cases." As we have already explained, evidence Melanson killed Andrews was much stronger than he admits and, in any event, its overall strength was not relevant to a section 352 analysis of the uncharged conduct. Furthermore, the fact that evidence of the uncharged rapes was strong does not mean it was unduly prejudicial. " 'Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. . . .' . . . [¶] 'The prejudice that section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations]. 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors. [Citation.]' [Citation.]" (*Branch*, *supra*, 91 Cal.App.4th at p. 286.)

Melanson argues that the prior rape evidence was inflammatory because it made him appear "vicious and dangerous," but those crimes were not more inflammatory than the brutal assault and murder of Anita Andrews. Furthermore, to the extent the prior offenses portrayed Melanson as vicious and dangerous they shared that quality with the charged offense. In other words, that factor made the evidence more probative as opposed to unduly prejudicial. Melanson also claims, but does not establish, that the uncharged rape evidence was overwhelming and confusing to the jury. The number of uncharged acts that were admitted cannot be considered in a vacuum; the court excluded almost as many acts as it admitted notwithstanding that the number of other offenses was itself probative evidence. Furthermore, we find no indication in this record that the jury was confused about any issue material to the judgment in this case.

18

Melanson also contends that the uncharged rapes should have been excluded because they were not sufficiently similar to the charged crime. To support this contention, Melanson relies on *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*). In that case, a mental health nurse was convicted of sex offenses based on allegations that he took advantage of two vulnerable women in his care. (*Id*. at p. 730.) On appeal, the defendant argued the trial court abused its discretion under section 1108 by admitting evidence of a violent sexual crime he committed 23 years before the charged crimes. (*Id*. at pp. 733-734.) That evidence included testimony by police officers who described finding the victim in her home, severely beaten, naked from the waist down, with blood on her vagina, mouth and face who " 'appeared to be unconscious,' " and finding the defendant, whose crotch was bloody, hiding nearby. (*Id*. at pp. 734-735.) The *Harris* jury was also told that, as a result of this prior conduct, the defendant was convicted of first degree burglary with the infliction of great bodily injury. (*Ibid*.)

The *Harris* court held that the trial court abused its discretion under section 1108 and 352 by admitting this prior act evidence. (*Harris, supra*, 60 Cal.App.4th at pp. 740-741.) The court reasoned that the evidence was "inflammatory *in the extreme*," the remoteness of the crime weighed heavily in favor of exclusion, the stipulation that the defendant was convicted of burglary left the jury to speculate about whether he had been punished for rape, and evidence of the prior violent sex offense had little relevance to the charged " 'breach of trust' sex crimes." (*Id*. at pp. 738, 740.) With regard to this last factor, the court noted that the charged offenses were "of a significantly different nature and quality than the violent and perverse attack on a stranger that was described to the jury." (*Id*. at p. 738.) Admitting that evidence, the court found, "did little more than show defendant was a violent sex offender," as it was not relevant to either bolster the credibility of the victims of the charged offenses or to detract from the evidence impeaching their testimony. (*Id*. at p. 740.)

Melanson argues his uncharged sex offenses are no more probative than the prior sex offense in *Harris*, pointing out that his other victims were younger than Andrews, that he took them to secluded places as opposed to a public bar, and that he did not kill

19

them.  This argument is legally and factually flawed.  First, as a legal matter, numerous section 352 factors that weighed in favor of exclusion in *Harris* support the trial court's contrary conclusion in this case.  Here, Melanson's prior offenses were not inflammatory, remote, or misleading.  Furthermore, the court guarded against the danger of unfair prejudice by limiting evidence of the Reba R. rape to the fact of conviction and punishment, admitting evidence that Melanson was punished for the Sandra S. rape, and granting a defense motion to exclude evidence that Melanson was held to answer for the Katherine O. rape, so the defense could develop its theory that Melanson was not guilty of that offense at all.

Second, and in any event, Melanson's assessment of the probative value of his uncharged rapes is patently unreasonable.  Contrary to his contention on appeal, the storeroom at Fagiani's bar was a secluded place.  Furthermore, the evidence showed that, although Melanson did not kill the victims of these other crimes, he threatened to kill both Katherine O. and Sandra S., he employed violence to strengthen those threats, and both victims submitted to his will because they believed they would have died if they had not.

Melanson argues that the Katherine O. rape was "particularly lacking in probative value" because the evidence that he was the perpetrator of that crime was extremely weak.  To support this contention, Melanson relies on an excerpt from Katherine O.'s preliminary hearing testimony when she was asked to point out the person that had been driving the truck that stopped to offer assistance with her flat tire.  It appears that she pointed out a person other than the defendant who was sitting in the courtroom.  The prosecutor responded that he did not know that person's name.  This particular excerpt is vague; it is not clear if Katherine O. misheard the question and thought she was supposed to identify the passenger of the truck, or if she really did identify someone other than Melanson as the person who drove the truck.  What is clear, though, is that whatever the confusion at that hearing, sufficient evidence was presented to hold Melanson to answer for the Katherine O. rape.

20

When viewed as a whole, the evidence supports the trial court's discretionary decision to admit evidence of the Katherine O. rape. As we have already noted, that incident was highly probative because of striking similarities with the present case, including that both victims were isolated and vulnerable, that they were punched in the face, and that their pants and undergarments were removed from just one leg during the assault. To the extent Melanson is arguing that Katherine O.'s possible misidentification of someone other than the defendant at the preliminary hearing was relevant, the jury heard that testimony and the defendant's interpretation of it. Furthermore, the trial court granted a defense motion to exclude evidence that he was held to answer for the Katherine O. rape, which further strengthened his theory in the present case that he did not rape Katherine O. Finally, the trial court instructed the jury that it could not consider evidence of the Katherine O. rape unless the prosecutor proved by a preponderance of the evidence that Melanson committed that crime, that if the prosecutor carried that burden the jury could still disregard the Katherine O. evidence and that if the jury elected to consider the Katherine O. evidence it was only one factor and not sufficient by itself to prove that Melanson committed the charged offenses.

Melanson argues that, in evaluating the trial court's rulings under section 352, we must consider the cumulative impact of the uncharged conduct evidence. As we have already demonstrated, every individual ruling was supported by a reasoned section 352 analysis. Furthermore, when viewed as a whole, the other act evidence covered roughly half of Melanson's prior offenses, all of which was potentially relevant evidence in this case. Yet, the trial court took steps to guard against unfair prejudice by limiting both the number of uncharged acts that were admitted and the evidence about the nature of those acts. Under all of the circumstances, we conclude that Melanson has failed to establish that the trial court abused its discretion in any way.[7]

---

[7] Because we find that the trial court properly exercised its discretion under section 352, we need not address Melanson's related contention that the allegedly erroneous evidentiary rulings were so prejudicial they violated Melanson's due process

21

**5.**     *Section 1108 and CALCRIM No. 1191*

Melanson's final argument with respect to the uncharged conduct evidence is that section 1108 and CALCRIM No. 1191 "are facially unconstitutional" because they permit the trier of fact to use the defendant's uncharged crimes as dispositional evidence.

"Evidence Code section 1108 allows bad conduct evidence to be admitted to prove 'predisposition' to commit sex crimes." (*Harris, supra*, 60 Cal.App.4th p.730.) This legal rule is reflected in CALCRIM No. 1191, which the trial court used to instruct the jury about the uncharged sexual offense evidence that was admitted in this case. That instruction stated, in part: "If you decide that the defendant committed the uncharged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit rape or attempted rape. If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of murder of Anita Andrews."

On appeal, Melanson does not challenge any specific language in CALCRIM No. 1191 but simply objects to it on the ground that it implements the exception codified in section 1108 authorizing jury consideration of "disposition" evidence. However, Melanson also concedes that the California Supreme Court considered and rejected his constitutional argument in *Falsetta, supra,* 21 Cal.4th 903. Since *Falsetta* is binding on this court, we summarily reject Melanson's facial challenges to section 1108 and CALCRIM No. 1191. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

---

right to a fair trial. We note for the record that the People contend Melanson waived this claim of error.

**B.**     *Precharging Delay*

    **1.**     *Issue Presented and Standard of Review*

Melanson contends that the trial court erroneously denied his motion to dismiss this case for precharging delay, i.e. the delay between the murder and the time the state first charged him for it.

"Although precharging delay does not implicate speedy trial rights, a defendant is not without recourse if the delay is unjustified and prejudicial. '[T]he right of due process protects a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence.' [Citation.] Accordingly, '[d]elay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions. A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay. The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay.' [Citation.]"    (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250 (*Nelson*).)

"We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [citation], and defer to any underlying factual findings if substantial evidence supports them [citation]." (*People v. Cowan* (2010) 50 Cal.4th 401, 431.)

    **2.**     *Background*

On September 8, 2011, Melanson filed a motion to dismiss this case because of the 36-year delay between the Andrews murder and the filing of charges against him. He argued that prejudice was presumed in light of the length of the delay and the prosecutor's negligence. According to Melanson, the State was negligent in failing to identify him earlier because (1) his fingerprints were on record in several states since before this crime occurred in 1974; and (2) it took too long to conduct DNA analysis on the crime scene evidence. Melanson also claimed actual prejudice because several

23

witnesses who had died could have aided his defense. The only specific witness Melanson discussed was Paul Grenier, who allegedly saw someone driving Andrews' car after the murder and helped create a composite sketch that did not look like Melanson.

The People opposed the motion to dismiss on the ground that "[t]he precharging delay was justified because law enforcement did not have enough evidence until the 2009 comparison of the crime scene evidence with the defendant's DNA resulted in a match." To support this proffered justification, the prosecutor outlined the following relevant events: Fingerprint evidence collected from the crime scene was used to conduct database searches in 1984, 1989 and 1990. The searches included California and were expanded to other western states but not ever to Colorado. The case went cold and was not reopened until late 2001 when Officer Jerich attended a cold case homicide training and was encouraged to consider pursuing DNA evidence. A few crime scene items were submitted in December 2001, but the DOJ criminalist did not begin the DNA testing until January 2004 because of the large backlog of cases. At that point, Liston Biel, who was still the prime suspect, was excluded as the source of the DNA samples, and the case went cold again. In 2006, a new officer was assigned to the case, additional evidence was analyzed, and the database hit that led to Melanson was made in October 2009. The DNA match was confirmed in December 2009 and, over the next eight months, investigators shored up the case against Melanson.

In opposing the motion to dismiss, the People also argued that Melanson failed to carry his burden of showing actual prejudice and that, even if prejudice was demonstrated, the delay was justified because it "was the result of limitations of forensic technology and insufficient evidence to identify defendant as a suspect."

The trial court denied the motion to dismiss in a written order filed September 20, 2011. The court reasoned that Melanson's showing of actual prejudice resulting from the interim death of potential witnesses was minimal because the claim that any of these witnesses could aid the defense was "speculative at best." By contrast, the justification for the delay in this case was strong because "there was no basis to suspect defendant of this crime without DNA evidence," and, once the DNA match was found, there was only

24

a short period before the prosecution obtained the additional evidence necessary to support the charges. The trial court also found that the delay was solely an "investigative delay," and that courts should not second-guess prosecutorial decisions about how to investigate a given case, how to allocate state resources, or when they have sufficient evidence to bring criminal charges. Ultimately, the court concluded that "balancing the prejudice defendant has demonstrated against the strong justification for the delay, the court finds no due process violation."

### 3. *Analysis*

Balancing Melanson's showing of prejudice from the delay in charging him with Andrews' murder against the justification for that delay, we affirm the trial court's determination that Melanson failed to establish that his due process rights were violated by the precharging delay.

First, Melanson's showing of prejudice was very weak. His theory that prejudice was presumed from the length of the delay was legally unsound. "To avoid murder charges due to delay, the defendant must affirmatively show prejudice." (*Nelson, supra*, 43 Cal.4th at p. 1250.) Furthermore, Melanson's factual showing that some potential witnesses had died was not compelling because he failed to address how any of those witnesses could have impacted this case. On appeal, Melanson does not specifically address any given witness but claims only that the court "unduly minimized the importance of the lost witnesses . . . ." This generic complaint, unsupported by any discussion of the evidence itself, is simply not sufficient to establish an abuse of discretion.

Second, the record supports the trial court's finding that the justification for the delay in charging Melanson was very strong. As the trial court observed, the 2009 DNA cold case hit was the first evidence that linked Melanson to this crime; before that he was not a suspect. After that, there was a very short period while the prosecutor collected additional evidence before the charges were brought.

On appeal, Melanson challenges the justification for the delay by claiming that this case "did not need to await DNA science" because fingerprints on the beer bottles

and the rum bottle "also tied appellant to the scene of the crime." Melanson maintains his fingerprints were "on record" in several states when Andrews was murdered and concludes that the prosecution could and should have identified him as a suspect at a much earlier date simply by broadening their database searches. Although Melanson fails to cite evidence that his fingerprints were "on record" in "several" other states, the People concede they were on record in Colorado. However, Melanson does not identify any evidence that was available to investigators before the DNA hit was made which even suggested that Andrews' murderer had fled to Colorado.

If Melanson is suggesting that due process requires that law enforcement must, as a matter of course, search every database in the country whenever it finds a fingerprint at a crime scene, he is mistaken. "A court may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case. . . . 'Thus, the difficulty in allocating scarce prosecutorial resources (as opposed to clearly intentional or negligent conduct) [is] a valid justification for delay . . . .' [Citation.] It is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner." (*Nelson, supra*, 43 Cal.4th at pp. 1256-1257.)

Melanson contends that, even if "it was not negligent to [not] run the fingerprints through other databases, the justification for the delay is still wanting as there was no non-negligent reason for the later delays in obtaining the DNA analysis." To support this argument, Melanson makes numerous assumptions about when advancements in DNA science were available to Napa County investigators and how those advancements should have been utilized in this specific case. These types of assumptions are precisely the type of second-guessing that courts are not willing to make.

Finally, even if there was some element of negligence, that would not be sufficient to establish error on appeal. When there is evidence of a purposeful delay, a weak showing of prejudice may suffice, but when "the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation." (*Nelson, supra,* 43 Cal.4th at p. 1256.) In the present case, the record supports the trial court's

26

conclusion that Melanson's showing of prejudice was extremely weak. Thus, as the trial court found, Melanson failed to establish that the precharging delay violated his rights to due process.

**C.     *The 2010 Photographic Lineup***

**1.     *Issue Presented***

Melanson contends that his due process right to a fair trial was violated because the trial court denied his pretrial motion to exclude evidence that David Luce identified him in a 2010 photographic lineup as the man Luce saw in the bar with Andrews in 1974.

" 'Due process requires the exclusion of identification testimony only if the identification procedures used were unnecessarily suggestive and, if so, the resulting identification was also unreliable.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 698 (*Avila*).) "Defendant bears the burden of showing unfairness as a demonstrable reality, not just speculation. [Citation.] 'The issue of constitutional reliability depends on (1) whether the identification procedure was unduly suggestive and unnecessary [citation]; and if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of [his] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation [citation]. If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable. [Citation.]" (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1222.)

"We independently review 'a trial court's ruling that a pretrial identification procedure was not unduly suggestive.' [Citation.]" (*Avila*, *supra,* 46 Cal.4th at pp. 698-699.)

**2.     *Background***

As noted in our factual summary, in January 2010 Detective Winegar showed David Luce a photographic lineup of six suspects including Melanson. All of the

photographs were black and white, were cut off just below the neck and were printed from Winegar's computer in the same manner.

The photograph of Melanson that was used in the lineup was taken on April 4, 1975. The other photographs were not from that same time period because Detective Winegar used other individuals who were the most similar looking to Melanson and he could not find older photographs that fit that requirement. The photograph of Melanson was digitally altered to remove markings in the background so that the background of his photograph would be "clear" like the background in the other photographs that were used in the lineup.

Before Winegar showed the line-up to David Luce, he read a standard admonition which, among other things, advised Luce that the group of photographs "may or may not contain the picture of the person who committed the crime" and that he should disregard "differences in the type or style of the photographs." At trial, Luce testified that Winegar did not do anything during the lineup procedure to suggest that Luce should select a particular photograph. Luce, who had looked at other lineups and composites over the years, selected Melanson's photograph although he was not 100 percent sure.

### 3.    *Analysis*

After independently reviewing evidence of the pretrial identification procedure that Detective Winegar employed, we affirm the trial court's ruling that admitting evidence of the results of that lineup did not violate due process. First, using a photograph of Melanson from the 1970's was absolutely necessary under the circumstances of this case, involving a 36-year-old cold case murder. Second, Winegar took steps to ensure that Melanson's photograph would not stand out, including using all black and white photographs, eliminating most of the clothing from the pictures, digitally altering the background of Melanson's photo so that it matched the others, and printing all of the photographs from the same computer.

We also find that, under the totality of the circumstances, the identification procedure that Detective Winegar employed was reliable. There is no dispute on appeal that Winegar selected photographs of similar looking individuals. He used identical

28

backgrounds and printed all of the pictures from the same computer in the same way. He gave a standard admonition and did not do anything to persuade Luce to select any given photograph.

On appeal, Melanson argues that his photograph "obviously taken in the 1970s— was inherently suggestive" because it came from the time of the offense while the others did not. Specifically, Melanson contends that his wide shirt collar and vest "harkened back to the 1970s," while the other men in the lineup wore modern looking shirts; his photograph was grainier than the others; and his long sideburns strongly suggested that his picture was taken at around the time of the offense.

We have looked at the photographic lineup, which was admitted into evidence as trial exhibit 72.[8] We agree that Melanson's shirt collar, if viewed in isolation, does appear old fashioned, although most of his clothing was cropped out of the picture. More importantly, neither the clothing nor hair styles of any other man in the line-up were distinctly "modern." Furthermore, it does not appear to us that Melanson's photograph had a distinctive "grainier" quality. Rather, all of the photographs are black and white and appear to share the same background.

"The question is not whether there were differences between the lineup participants, but 'whether anything caused defendant to "stand out" from the others in a way that would suggest the witness should select him' [Citation.]" (*Avila*, *supra,* 46 Cal.4th at p. 698.) We do not find that the use of Melanson's 1975 photograph made him "stand out" from the others in a way that would have unfairly suggested to Luce that he should select that photograph. Furthermore, when viewed as a whole, the procedure that Detective Winegar employed was reliable. Therefore, we reject Melanson's claim that his constitutional rights were violated because the court admitted evidence of the results of the 2010 photographic lineup.

---

[8] The People mistakenly contend that the lineup has not been made a part of the record on appeal.

29

## IV.  DISPOSITION

The judgment is affirmed.

_____
Haerle, Acting P.J.

We concur:


_____
Lambden, J.


_____
Richman, J.